# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

IRIS N. WILSON,                                    Case No:

      **Plaintiff,**

vs.

CSX TRANSPORTATION, INC.

      **Defendant.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Iris N. Wilson, hereby sues Defendant CSX Transportation, Inc. and alleges:

### Nature of Action

1. This is an action by an employee against her employer for unlawful employment practices under the Family and Medical Leave Act, the Florida Civil Rights Act, and Title VII of the Civil Rights Act of 1964, and for breach of implied contract.

### Parties

2. Plaintiff, Iris N. Wilson ("Wilson") is a 52-year-old, African American, female who resides in Duval County, Florida.

{00398807 1 }

3.   Defendant, CSX Transportation, Inc. ("CSXT") is a corporation incorporated in the State of Virginia with a headquarters and principal place of business in Duval County, Florida.

4.   CSXT employs approximately 19,400 employees, most of whom are unionized, that are divided organizationally into departments and geographically into regions throughout several states.

### Jurisdiction and Venue

5.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) over the civil actions alleged herein arising under the laws of the United States.

6.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) (supplemental jurisdiction) over the other claims alleged herein because they are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

7.   Venue is proper in this Court because Wilson resides in Duval County, Florida, CSXT's headquarters and principal place of business is in Duval County, Florida, and the facts of the case arise from acts and omissions in Duval County, Florida.

### Nature of CSXT's Business and Employment of Wilson

8.  CSXT is a railroad transportation company operating in the Eastern United States and Canada.

9.  Wilson was initially hired by CSXT as a clerk under the clerical collective bargaining agreement on January 20, 1999.  During her employment with CSXT, Wilson was promoted into multiple management positions, including promotion to Crew Operations Supervisor on May 1, 2018.

10. Wilson has been promoted numerous times over almost 20 years of loyal service to CSXT.  Wilson has received excellent performance evaluations over the course of her employment.

11. In early 2019, Wilson served as Crew Operations Supervisor and reported directly to Jori Lovelady, who at that time was Director of Crew Management.

12. Jori Lovelady ("Lovelady"), as Director of Crew Management, reported directly to Lauren DeAlexandris, who at that time was Head of Crew Management.

13. Lauren DeAlexandris ("DeAlexandris"), as Head of Crew Management, reported directly to Walter Sieruga ("Sieruga"), who at that time was General Manager of Network Operations.

## Workplace Romance

14. At some point during 2018 or 2019, Lovelady and Sieruga initiated a workplace romantic relationship that was also an extra-marital affair for each of them because they were married to other people at the time.

15. The workplace romantic relationship between Lovelady and Sieruga put Wilson in the position of reporting directly to Lovelady, a supervisor who was in a romantic relationship with Sieruga, the General Manager over the operational unit in which Wilson worked.

16. CSXT adopted a workplace "Nepotism & Fraternization" policy that was in place and effective during the relevant time frame, including 2018, 2019, 2020 and to the present day.  A copy of the Nepotism & Fraternization policy is attached as **Exhibit A**.  The Nepotism & Fraternization policy prohibits romantic relationships between employees when one supervises the other or they are in the same line of responsibility.

17. The romantic relationship between Lovelady and Sieruga was a violation of the Nepotism & Fraternization policy because they were in the same line of responsibility.

18. The Nepotism & Fraternization policy also provides that employees who have a good faith reasonable belief as to the existence of a relationship that violates the policy are encouraged to report the information to their manager, human

resources business partner, or to the company's ethics hotline.  The policy further prohibits retaliation against an employee who makes such a report.

19. In early 2019, Wilson reported the romantic relationship between Lovelady and Sieruga to Kimberly L. Waller ("Waller"), the human resources business partner assigned to Wilson's business unit.  Wilson further reported the romantic relationship by calling the CSXT hotline on multiple occasions.

20. Waller, in her role as human resources business partner, sent a reminder dated March 5, 2019 to "everyone" as a note to remind employees in Wilson's business unit of the company's nepotism policy.  DeAlexandris was a recipient of Waller's reminder email and forwarded the reminder about the nepotism policy to her direct reports, including Wilson and Lovelady.  It is not apparent whether the reminder about nepotism was sent to Sieruga.  A copy of the March 5, 2019 email reminder is attached as **Exhibit B**.

21. DeAlexandris knew about the romantic relationship between her subordinate, Lovelady, and her boss, Sieruga.  Lovelady, DeAlexandris, and Sieruga all knew that the romantic relationship violated the Nepotism & Fraternization policy and that Wilson had reported the romantic relationship to human resources and to the CSXT hotline.

22. Sieruga, DeAlexandris, and Lovelady displayed antagonism, dislike, and animus towards Wilson for several reasons including Wilson's reports of the romantic relationship to human resources and to the CSXT hotline.

23. Sieruga (white), DeAlexandris (white), and Lovelady (white) also displayed antagonism, dislike, and animus towards Wilson for reasons that included racial bias which was exacerbated by Wilson's calls to human resources and to the CSXT hotline over the romantic relationship between Lovelady and Sieruga.

### The August 2019 Automobile Accident

24. Wilson was scheduled to be away from the workplace on an approved paid vacation from August 3, 2019, through August 12, 2019.  Wilson's last day worked before vacation was August 2, 2019, and Wilson's first day scheduled to return to work following vacation was August 13, 2019.

25. On August 5, 2019, while Wilson was on her scheduled and approved vacation, she was involved in an automobile accident that caused her a serious health condition, including injury, impairment, and physical condition that involved care in a hospital and continuing treatment by a health care provider.

26. As a result of the serious health condition caused by the automobile accident, Wilson was not able to return to work as scheduled following vacation on August 13, 2019.

27. On the same day as the automobile accident, Wilson's sister Lisa Smith notified Lovelady, as Wilson's supervisor, that Wilson had been involved in an automobile accident and that she would be out of work during her recovery from her serious health condition.

28. Lovelady notified her boss, DeAlexandris, very shortly thereafter that Wilson had been involved in an automobile accident.

29. On Monday, August 12, 2019, only a week following the automobile accident resulting in a serious health condition, DeAlexandris sent an email to CSXT's chief medical officer, Dr. Craig Heligman ("Dr. Heligman"), which states, in part:

> Dr. H, We have another issue with Ms. Wilson. She was supposedly in an auto accident last week while out on vacation. She is now saying she will see a neurologist and cannot return to work this week. She is scheduled to start working nights this week (tomorrow evening). Her schedule continues to be 4 consecutive, 12 hour days. This will be the 3rd vacation in a row that she will not return to work for medical reasons, and we will once again have to rearrange several other employees' schedules to cover for her absence(s).

30. No one at CSXT, including Lovelady or DeAlexandris, had notified Wilson about "another issue" or any workplace performance issues, including any issues that arose during Wilson's approved vacation time away from work.

31. Wilson did not request, and CSXT did not notify Wilson, that any of her time away from work during the 12 months before her August 2019 automobile accident would be treated by CSXT as a leave of absence under the FMLA.

32. DeAlexandris asked Dr. Heligman by email on August 12, 2019: "Are we obligated to take her word for these events? In other words, can / should we ask for accident and/or medical documentation?", to which Dr. Heligman responds:

> No, we are not obligated to take her word, but we generally do. If you have some evidence to suggest that she is fraudulently reporting medically related absences, then we would want to obtain guidance from HR and Law depts. There is no company wide policy on medical related absences for management employees. You may ask her to submit FMLA documents for medical issues that may qualify for FMLA benefits. Injuries secondary to an MVA that may incur absences longer than 3 days would generally qualify for FMLA. This may be a route you want to take. I'd ask SuDelta Henson for guidance on that.

33. Dr. Heligman further responds to DeAlexandris's email of August 12, 2019 by advising:

> I would look at how much time she has left under FMLA and have her apply for FMLA leave whenever it is appropriate to do so. This will run out her FMLA entitlement more quickly. Make sure that she appropriately applies for STD benefits. If she exhausts FMLA and STD benefits, then typically, you can work with HR to determine if her position can be filled. Regular attendance at work is an essential function of the job, so we would want to look at that issue with HR/legal to make sure we are following all regulations, laws, and company policies related to her medical related absences prior to terminating and posting her position.

34. The email exchange between DeAlexandris and Dr. Heligman demonstrate that both of them knew that Wilson had suffered a qualifying event under the FMLA, and yet, neither of them or Lovelady asked Wilson to submit any request or documentation for consideration of her FMLA leave.

35. Dr. Heligman goes on to advise DeAlexandris in his email response of August 12, 2019:

> Lastly, when she is at work, her performance should be judged on the same performance expectations as would be expected of others in the same job. If while at work, she is not meeting your performance expectations, then it is best to document as thoroughly as possible in case you need to consider what options you have based upon poor performance. If she claims poor performance based upon her medical status, then you may ask her to take leave as an accommodation (limited period off work under FMLA/STD/ADA to allow her medical condition to be treated and stabilized before returning to work) and go down the route noted above. If this is a straight forward performance deficiency, then you go down the performance management route.
>
> Our best defense for individuals who potentially are abusing/misusing the system is to use good management and compliance with existing company and regulatory policies and benefits. The tighter the management using these existing items the easier it is. I recognize that it is frustrating to manage someone under these circumstances, but we do have to maintain compliance and if someone may be abusing/misusing the system, then following the existing processes will address the issue in the long run. It does take time to reach the end point, however.

36. These email exchanges between DeAlexandris and CSXT's chief medical officer on August 12, 2019, a mere seven (7) days following Wilson's automobile

Case 3:21-cv-01212-HLA-PDB   Document 1   Filed 12/08/21   Page 10 of 27 PageID 10

accident, show bias against Wilson and the intent by these senior CSXT management employees to willfully violate the FMLA by engaging in intentional manipulation so that Wilson would be forced from her position.

37. The email exchange of August 12, 2019 between DeAlexandris and Dr. Heligman also demonstrates DeAlexandris's unfounded view that Wilson should not be trusted when she reported that she was in an automobile accident, much less that she suffered a serious health condition requiring hospital care or ongoing medical care. Such lack of trust demonstrates unfounded bias against Wilson for wrongful reasons. A copy of the August 12, 2019 email exchange is attached as **Exhibit C**.

### CSXT Attendance and Leave of Absence Policies

38. CSXT has adopted the "CSX Attendance and Accountability Policy for Management Employees." ("Attendance Policy"). A copy of the Attendance Policy is attached as **Exhibit D**. The Attendance Policy provides guidelines and establishes responsibilities for management employees who are absent from work, including absences caused by personal injury such as an automobile accident.

39. Wilson was a management employee in August 2019 and complied with all requirements, guidelines, and responsibilities of the Attendance Policy and no one from CSXT has notified her otherwise.

40. The Attendance Policy references the company's Medical Leaves of Absence Policy, but does not make reference to a published FMLA policy for management employees.

41. CSXT has adopted "Medical Leaves of Absence Policy" which provides information to management employees about the company's short-term disability ("STD") and long-term disability ("LTD") benefits as well as procedures for administering leaves of absence when an eligible management employee is medically unable to work due to a personal injury, illness and complications of pregnancy.  A copy of the Medical Leaves of Absence Policy is attached as **Exhibit E**.

42. The Medical Leaves of Absence Policy makes numerous references to the company's FMLA policy, but CSXT does not have a published FMLA policy for management employees and the references are to a policy that is either non-existent or not available to Wilson for reference.

43. CSXT has published "Employee Rights under the Family and Medical Leave Act," a copy of which is attached as **Exhibit F**, but this statement of rights is merely the poster required by the Department of Labor regulations.  It is not supported by a published FMLA company policy that satisfies the notice requirements of the FMLA or the Department of Labor's supporting regulations.

44. On August 12, 2019, the same day as the email exchange between DeAlexandris and Dr. Heligman, Jolonda Johnson ("Johnson"), Senior Manager of Benefits, called Wilson by telephone. In this telephone conversation, Jolonda Johnson told Wilson that, as a manager, Wilson did not have to apply for an FMLA leave of absence and should instead follow the Medical Leaves of Absence policy, which provided for up to 26 weeks of leave.

45. The CSXT Senior Manager of Benefits, Johnson, did not inform Wilson about how many days had already been credited to her entitlement for an FMLA leave of absence or otherwise satisfy the notice requirements of the FMLA or the Department of Labor's supporting regulations.

46. The CSXT Senior Manager of Benefits, Johnson, did not inform Wilson that her FMLA leave would be exhausted before the end of August 2019 or that she would be replaced if she failed to return to work before her FMLA leave was exhausted.

47. As directed by CSXT Senior Manager of Benefits, Wilson submitted a claim for STD benefits pursuant to the Medical Leaves of Absence policy.

48. The CSXT Medical Leaves of Absence policy was administered by a third-party administrator, CIGNA.  However, CIGNA did not evaluate requests for leaves of absence under the FMLA or otherwise satisfy CSXT's notice obligations under the FMLA or the Department of Labor's supporting regulations.

49. By letter dated September 23, 2019, CIGNA denied Wilson's request for STD benefits, but CIGNA did not evaluate whether Wilson was entitled to a leave of absence pursuant to the FMLA.   A copy CIGNA's September 23, 2019 letter denying STD benefits is attached as **Exhibit G**.

50. Wilson's request for STD benefits was evaluated by CIGNA based on criteria that do not correspond to, and are not compliant with, the criteria that should be properly applied when considering a leave of absence under the FMLA.

51. The Medical Leaves of Absence policy provides at section 8.b. on page 7 of 10 that:

> If your request for STD leave is denied, your medical leave of absence may still qualify as FMLA leave. If your STD leave is denied and you do not meet the eligibility requirements or have leave available under the FMLA, the Company will notify you that your FMLA leave is also denied. However, if your STD leave is denied but you meet the eligibility requirements and have leave entitlements under the FMLA, the Company's FMLA Administrator will send you information regarding your rights and responsibilities under the FMLA and provide you with a medical certification.  You and your physician must complete this medical certification and return it to the Company's FMLA Administrator within the required timeframe.  FMLA Administration will then notify you whether absences will be protected under the FMLA. Please see your company's FMLA Policy for additional information.

52. Notwithstanding CIGNA's denial of Wilson's request for STD benefits on September 23, 2019, no one at CSXT took the steps required by the Medical Leaves

of Absence policy or to otherwise consider whether Wilson was qualified for a leave of absence under the FMLA.

53. The company did not notify Wilson that her FMLA leave of absence was denied or had already been exhausted.

54. The Company's "FMLA Administrator" did not send Wilson information about her rights or any other documents or information.

55. The so-called FMLA Administrator did not notify Wilson whether absences would be protected under the FMLA and there is no such FMLA policy to see for additional information.

56. Information was not provided to Wilson through a published policy or otherwise about who the "FMLA Administrator" is or where this person can be located or contacted.

57. Likewise, no information can be found on the content, location, or even existence of the "Company's FMLA Policy" that Wilson should consult for additional information.

58. No one at CSXT told Wilson that she had used any of her FMLA leave or that any of her days away from work were considered by CSXT as counting towards exhaustion of her entitlement to FMLA leave until October 2, 2019, when Kimberly Waller, human resources business partner for CSXT, notified Wilson

that her FMLA leave was exhausted weeks earlier on August 28, 2019, and that her position as Crew Operations Supervisor had been filled by another person.

59. However, the CSXT employee portal reflected that Wilson had 480 hours of remaining FMLA leave and 120 hours of paid sick time that was available to her. A screenshot of Wilson's employee portal as of December 9, 2019, reflecting 600 hours of available leave is attached as **Exhibit H**.

60. Waller also notified Wilson for the first time on October 2, 2019 that CSXT was giving her the option to accept a demotion of her position to crew dispatcher or be terminated from employment.

61. CSXT did not pay Wilson for the timeframe October 1, 2019 through her return to work on November 19, 2019, even though her employee portal reflected 120 hours of remaining paid sick time.

62. CSXT did not restore Wilson to the position of employment that she held when the FMLA leave commenced and did not restore Wilson to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.

63. Wilson's demotion also resulted in a loss of employment benefits accrued prior to the date on which the leave commenced.

64. Wilson was not offered the opportunity to work remotely during her leave of absence even though other similarly situated white employees were offered the opportunity to work remotely.

65. Wilson's healthcare provider gave written medical clearance to return to work on November 17, 2019 and Wilson returned to work in her demoted position on November 18, 2019, earning significantly less wages and receiving significantly reduced benefits.  Wilson remains employed by CSXT in her demoted position today.

### Marriage and Termination

66. Meanwhile, the workplace romantic relationship between Lovelady and Sieruga continued unabated in violation of the company's Nepotism and Fraternization policy.

67. On June 15, 2021, Lovelady and Sieruga were married after they each divorced their respective spouses.  Thereafter, Lovelady was separated from CSXT to eliminate the ongoing violation of the company's Nepotism and Fraternization policy.  The marriage and subsequent separation of Lovelady demonstrates that Wilson's complaints of a workplace romance in violation of company policy were true.

**Charge of Discrimination**

68. Wilson filed her charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on May 20, 2020, alleging unlawful employment practices based on race, sex, age, and disability. The charge of discrimination was dual filed with the Florida Commission on Human Relations. A copy of the May 20, 2020 charge of discrimination is attached as **Exhibit I**.

69. On August 23, 2021, the EEOC issued its Letter of Determination in which it found that there is reason to believe that violations of law occurred. A copy of the Letter of Determination is attached as **Exhibit J**.

70. On September 22, 2021, the EEOC issued a Dismissal and Notice of Rights. A copy of the Dismissal and Notice of Rights is attached as **Exhibit K**.

71. Wilson has engaged the undersigned attorneys and is obligated to pay them a reasonable fee. Pursuant to applicable statutes as alleged below, Defendant CSXT is obligated to pay same.

72. All conditions precedent to the institution and maintenance of this action have been satisfied.

## COUNT I

### (FMLA interference)

73. This is a cause of action for FMLA interference pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, 2615(a)(1).

74. Plaintiff realleges paragraphs 1 through 72 above.

75. CSXT failed to notify Wilson of her eligibility to take FMLA leave after Wilson's automobile accident in August 2019.

76. CSXT failed to notify Wilson of her eligibility to take FMLA leave after any other qualifying reason during the 12 months before Wilson's automobile accident in August 2019.

77. CSXT failed to adopt or publish an FMLA policy providing reasonable notice to Wilson and to other similarly situated management employees and further failed to provide written notice of rights and responsibilities to Wilson and to other similarly situated management employees, including failure to give notice of the following:

    a.   That leave would be designated and counted against an employee's annual FMLA leave entitlement and the applicable 12-month period for FMLA entitlement;

    b.   Requirements for an employee to furnish certification of a serious health condition, serious injury or illness, or the consequences of failing to do so;

  c. Employee's right to substitute paid leave, whether the employer will require substitution of paid leave, the conditions related to any substitution, and the employee's entitlement to take unpaid FMLA leave if employee does not meet the conditions for paid leave;

  d. Employee's status as a key employee and the potential consequence that restoration may be denied following FMLA leave, explaining the conditions required for such denial; and

  e. Employee's rights to maintenance of benefits during the FMLA leave and restoration to the same or an equivalent job upon return from FMLA leave.

78. Representatives of CSXT failed to responsibly answer questions from Wilson concerning her rights and responsibilities under the FMLA.

79. CSXT failed to timely give Wilson notice on whether days out of work would be designated as FMLA-qualifying.

80. CSXT failed to timely inform Wilson that her employer required paid leave to be substituted for unpaid FMLA leave or that paid leave taken under an existing leave plan would be counted as FMLA leave.

81. CSXT failed to timely notify Wilson of the amount of leave counted against Wilson's FMLA leave entitlement.

82. CSXT failed to select any one of the appropriate methods for determining the 12-month period in which the 12 weeks of leave entitlement occurs.

83. CSXT failed to return Wilson to the same position she held when her FMLA leave allegedly commenced, or to an equivalent position with equivalent benefits, pay and other terms and conditions of employment.

84. CSXT's interference with Wilson's rights under the FMLA was knowing, intentional, willful, and showed reckless disregard for whether its conduct was prohibited by statute.

85. Wilson has suffered damages in the amount of wages, salary, employment benefits, and other compensation denied or lost because of the foregoing violations of the FMLA.

WHEREFORE, Iris N. Wilson demands judgment against CSX Transportation for damages equal to wages, salary, employment benefits, and other compensation, interest on such damages, and an additional amount as liquidated damages, plus reinstatement and other equitable relief as the Court determines appropriate.  Plaintiff also requests reasonable attorney's fees and costs.

## COUNT II
### (FMLA retaliation)

86. This is a cause of action for FMLA retaliation pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, 2615(a)(2).

87. Plaintiff realleges paragraphs 1 through 72 above.

88. CSXT retaliated against Wilson when it failed to return Wilson to the same position she held when her FMLA leave commenced, or to an equivalent position with equivalent benefits, pay and other terms and conditions of employment.

89. CSXT also retaliated against Wilson by not offering the opportunity to work remotely during her leave of absence even though other similarly situated employees were offered the opportunity to work remotely.

90. The unlawful discrimination and retaliation of CSXT against Wilson was because Wilson requested leave of absence for a serious health condition as permitted by law.

91. CSXT's discrimination and retaliation against Wilson was knowing, intentional, willful, and showed reckless disregard for whether its conduct was prohibited by statute.

92. Wilson has suffered damages in the amount of wages, salary, employment benefits, and other compensation denied or lost because of the foregoing violations of the FMLA.

WHEREFORE, Iris N. Wilson demands judgment against CSX Transportation for damages equal to wages, salary, employment benefits, and other compensation, interest on such damages, and an additional amount as liquidated

damages, plus reinstatement and other equitable relief as the Court determines appropriate.  Plaintiff also requests reasonable attorney's fees and costs.

## COUNT III

### (Race discrimination per Title VII of Civil Rights Act of 1964)

93. This is a cause of action for race discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

94. Plaintiff realleges paragraphs 1 through 72 above.

95. Plaintiff is a member of a protected category.  Specifically, Wilson is an African American woman.

96. CSXT took adverse action against Wilson when it failed to return Wilson to the same position she held when her leave commenced, or to an equivalent position with equivalent benefits, pay and other terms and conditions of employment.

97. Wilson was not offered the opportunity to work remotely during her leave of absence even though other similarly situated white employees were offered the opportunity to work remotely.

98. CSXT replaced Wilson in her management position with a less qualified white man.

99. Race discrimination was a motivating reason for CSXT to demote Wilson and replace her with a less qualified white man and race discrimination was a

motivating reason for CSXT to not offer Wilson the opportunity to work remotely during her leave of absence.

100.    The EEOC determined there was cause to believe that CSXT violated the law when it demoted Wilson.

101.    Wilson has suffered damages, including economic losses and mental anguish.

WHEREFORE, Iris N. Wilson demands judgment against CSX Transportation for compensatory damages as permitted by law, punitive damages, interest, reinstatement to her former position, attorneys fees and costs, plus other equitable relief as the Court might determine appropriate.

## COUNT IV
### (Race discrimination per Florida Civil Rights Act)

102.    This is a cause of action for race discrimination pursuant to the Florida Civil Rights Act, Fla. Stat. § 760.10(1)(a).

103.    Plaintiff realleges paragraphs 1 through 72 above.

104.    Plaintiff is a member of a protected category.  Specifically, Wilson is an African American woman.

105.    CSXT took adverse action against Wilson when it failed to return Wilson to the same position she held when her leave commenced, or to an equivalent

position with equivalent benefits, pay and other terms and conditions of employment.

106. Wilson was not offered the opportunity to work remotely during her leave of absence even though other similarly situated white employees were offered the opportunity to work remotely.

107. CSXT replaced Wilson in her management position with a less qualified white man.

108. Race discrimination was a motivating reason for CSXT to demote Wilson and replace her with a less qualified white man and race discrimination was a motivating reason for CSXT to not offer Wilson the opportunity to work remotely during her leave of absence.

109. The EEOC determined that there was cause to believe that CSXT violated the law when it demoted Wilson.

110. Wilson has suffered damages, including economic losses and mental anguish.

WHEREFORE, Iris N. Wilson demands judgment against CSX Transportation for compensatory damages as permitted by law, punitive damages, interest, reinstatement to her former position, attorneys fees and costs, plus other equitable relief as the Court might determine appropriate.

## COUNT V

### (Breach of implied contract)

111.  This is an action for damages for common law breach of an implied-in-fact contract.

112.  Plaintiff realleges paragraphs 1 through 72 above.

113.  The publications of CSXT, including the Nepotism and Fraternization policy, Attendance Policy, the Medical Leaves of Absence policy, and the FMLA notice constitute reciprocal promises, rights, and obligations between CSXT and management employees of CSXT (collectively referred to as the "Publications of CSXT").

114.  The Publications of CSXT constituted an implied contract (the "Implied Contract") and formed part of the terms and conditions of Wilson's employment at CSXT.

115.  CSXT materially breached the Implied Contract by failing to pay Wilson while she was on leave of absence in 2019.

116.  CSXT also materially breached the Implied Contract when it failed to return Wilson to the same position she held when her leave commenced, or to an equivalent position with equivalent benefits, pay and other terms and conditions of employment.

117. CSXT also materially breached the Implied Contract by retaliating against Wilson because of her complaints of violations of the Nepotism and Fraternization policy.

118. Wilson has suffered damages because of CSXT's material breaches of the Implied Contract, including lost past and future wages and benefits of employment.

WHEREFORE, Iris N. Wilson demands judgment against CSX Transportation for damages, interest, costs, reinstatement, and such other equitable relief as the Court might determine is appropriate.

### Demand for trial by jury

Plaintiff Iris N. Wilson hereby demands a trial by jury for all issues so triable herein.

Dated this _____8_____ day of December 2021.

Respectfully submitted,

ALEXANDER DEGANCE BARNETT, P.A.

By: _____

    Mark G. Alexander
    Florida Bar No. 434078
    E-mail: mark.alexander@adblegal.com
    Kelly DeGance
    Florida Bar No. 0606022
    E-mail: Kelly.degance@adblegal.com
    E-mail: mailbox@adblegal.com
    1500 Riverside Avenue
    Jacksonville, FL 32204
    (904) 345-3277 Telephone
    (904) 345-3294 Facsimile

    *Attorneys for Plaintiff*