# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

IRIS N. WILSON,

     Plaintiff,

                                                Case No. 3:21-cv-1212-TJC-PDB

v.

CSX TRANSPORTATION, INC.,

     Defendant.

---

# O R D E R

Plaintiff Iris Wilson is suing her employer, CSX Transportation, Inc. ("CSXT"), alleging: interference with her rights under the Family and Medical Leave Act of 1993 (FMLA), her demotion was due to race discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), race discrimination under the Florida Civil Rights Act of 1992 (FCRA), and retaliation for exercising her FMLA rights.[1] This case is before the Court on CSXT's Motion for Summary Judgment, Wilson's opposition, CSXT's reply, surreplies from both Wilson and CSXT and all exhibits thereto. Docs. 44, 46, 52, 59, and 68 respectively. On

---

[1] FCRA claims are analyzed under the same framework as Title VII. See, e.g., Jones v. United Space Alliance, L.L.C., 494 F.3d 1306, 1310 (11th Cir. 2007) (noting Florida courts apply Title VII caselaw when interpreting the FCRA); see also Johnson v. Miami-Dade Cty., 948 F.3d 1318, 1325 (11th Cir. 2020) (applying Title VII race discrimination claim analysis to FCRA).

February 21, 2024, the Court held a hearing on the motion and incorporates that discussion by reference. Doc. 76.

## I.   Facts[2]

A. <u>Overview of Wilson's Employment</u>

CSXT hired Wilson in 1999, and she was promoted several times, including to Crew Operations Supervisor on May 1, 2018. Doc. 47-1 at 9-10[3]; Doc. 36 ¶9. In that role, Wilson reported to Jori Lovelady, Director of Crew Management; Lovelady reported to Lauren DeAlexandris, Head of Crew Management; and DeAlexandris reported to Walter Sieruga, General Manager of Network Operations. Doc. 47-1 at 14.

The Crew Operations Supervisor is a critical role, responsible to ensure trains are running and train crews depart on time, including overseeing crew dispatchers, who ensure train engineers and conductors are at work. Doc. 44-2 ¶¶5–7; Doc. 44-16 at 27-28; Doc. 44-17 at 15-16; Doc. 47-1 at 69-70. Because trains run every day and all day, the Crew Operations Supervisors are needed 24 hours a day, every day of the year, and any absence must be covered by another supervisor.[4] Doc. 44-2 ¶¶5-7; Doc. 44-17 at 15-16; Doc. 44-19 at 47.

---

[2] These facts are construed in the light most favorable to Wilson.

[3] Citations for condensed deposition transcripts are to the deposition page number.

[4] There were eight Crew Operations Supervisors, including Wilson. <u>See</u> Doc. 44-17 at 16.

During her deposition, Wilson agreed her role was critical and testified "[e]very job in operations is very critical," one could not "run a railroad without having someone in operations," and someone is employed in her position all day long, every day of the year. Doc. 47-1 at 65-67.

B. <u>2018 and 2019 Leaves and Leave Administration</u>

In December 2018, Wilson was taken from work to the hospital for emergency gall bladder surgery. Doc. 46 at 2; Doc. 47-1, Exh. 10. Wilson was out of work for 3.4 weeks (136 hours). Doc. 44-3 ¶4. In late April 2019, Wilson asked to adjust her work schedule to address anxiety and other issues, but CSXT denied the accommodation and instead provided leave for 5 weeks (200 hours), from May 4, 2019, to June 9, 2019. Doc. 47-1 at 43, 194-99; Doc. 44-3 ¶5. On August 5, 2019, Wilson was in an automobile accident during her vacation, and could not return to work as scheduled. <u>See</u> Doc. 47-1 at 229-32. Wilson anticipated returning to work on October 1, 2019, but continued to have pain and could not return until November 18, 2019–an absence of 15 weeks (600 hours[5]). <u>See</u> Doc. 47-1 at 180-81, 190-91. Wilson did not apply for FMLA for any of these leaves. <u>See</u> Doc. 47-1 at 38. These three leaves totaled 23.4 weeks (936 hours), all within a 12-month period.

---

[5] This is calculated using a forty hour workweek and copies the CSXT calculation that the earlier five week leave was 200 hours.

CSXT has a Medical Leaves of Absence Policy ("Medical Leave Policy"), and a FMLA Policy. Docs. 36-3, 36-5. CSXT mistakenly told Wilson she did not need to apply for FMLA and had 26 weeks of leave under the Medical Leave Policy. Doc. 47-1 at 30-31, 52.[6] The FMLA policy provides up to 12 weeks of job protected leave. Doc. 36-5. The Medical Leave Policy states CSXT "will make every effort to hold a position open for up to 26 weeks" for employees on approved short-term disability ("STD") leave, but it "may decide to fill an employee's position prior to the expiration of STD leave" if it "determines that business needs warrant filling the employee's position." Doc. 36-3 at 7. Wilson's STD claim after the auto accident was denied. Doc. 47-1 at 211; Doc. 52-8 at 141-42.

In 2019, CSXT changed part of its leave process for management employees, so that if STD were denied, FMLA would run concurrently with the leave. See Doc. 44-17 at 46-50. Because this change was made after Wilson's five week leave in May to June 2019, the May to June leave was not initially designated as FMLA.[7] See Doc. 44-17 at 84-86, 89, 121-24. After Wilson's auto

---

[6] Even though FMLA is not required to be paid, Wilson was paid after the auto accident until her estimated return to work date, but her time off between October 1, 2019, and November 18, 2019, was unpaid. See Doc. 47-1 at 212.

[7] At the time of the policy change, Wilson's situation was the only one being discussed. Doc. 44-17 at 57-59.

accident, DeAlexandris inquired about Wilson's FMLA balance and was told Wilson had 8.6 weeks left. Doc. 44-17 at 84-86. Given Wilson's time off, DeAlexandris questioned this, and Wilson's prior time off (the five weeks in May to June) was retroactively designated as FMLA. See Doc. 44-17 at 121-24. This left Wilson 3.6 weeks of FMLA when the accident occurred. See Doc. 47-8 ¶12. Wilson exhausted FMLA on August 28, 2019. Doc. 52-8 at 124, Exh. 20.

Even though CSXT had designated two of Wilson's leaves as FMLA, Wilson received no notice of either the FMLA designations or her FMLA balance. CSXT did not follow its normal process regarding FMLA leave, including by not providing Wilson timely notice that any of her three leaves were designated as FMLA. Doc. 44-17 at 69-71. The retroactive designation meant Wilson exhausted FMLA without ever applying for FMLA, and when she finally learned of the FMLA designation, FMLA was already exhausted.[8] Doc. 47-1 at 37-39; Doc. 52-8 at 133; Doc. 44-17 at 49-50, 76-77, 100, 121.

Wilson expected to return to work on October 1, 2019, but could not.[9] See Doc. 47-1 at 180-81. CSXT contacted Wilson the next day and determined she did not have another date for an expected return to work. Doc. 52-8 at 57-58. In

---

[8] Wilson had continued problems from the accident and, in 2022, CSXT approved intermittent FMLA leave related to those injuries. Doc. 47-1 at 62-63.

[9] Wilson could not return due to "many other issues with [her] back and the MRI revealed a bulging disc and . . . three herniated spots." Doc. 47-1 at 190.

the call, CSXT told Wilson her FMLA leave had been exhausted and her position would be filled. Doc. 52-8 at 57-58; <u>see</u> Doc. 47-1 at 11, 57. This was the first time Wilson learned her leaves had been designated as FMLA, that FMLA had been exhausted, and that she would not be restored to the same job.[10] <u>See</u> Doc. 47-1 at 57. According to Wilson, the retroactive FMLA designation and late notice prevented her from inquiring about or considering other treatment options that might have shortened her leave(s) and allowed her to keep her reinstatement rights to return as Crew Operations Supervisor. Doc. 47-8 ¶¶12-14.

CSXT provided Wilson sixty days to apply for another management position or she could return to a craft (union) position. Doc. 52-8 at 57-58; <u>see</u> Doc. 47-1 at 11. If she did not find or take another role, she would be terminated. <u>See</u> Doc. 47-1 at 11-12. Wilson's leave ended on November 18, 2019, and she returned to work on November 19, 2019. Doc. 47-1 at 230-32. Because Wilson could not find another management role, she returned to a crew dispatcher role, a union position and a demotion. <u>See</u> Doc. 47-1 at 11-14.

---

[10] CSXT sent Wilson two letters on September 18, 2019. One stated her "leave from work . . . has been designated as FMLA leave." Doc. 47-1, Exh. 3. The other notified Wilson she had "exhausted [her FMLA] leave entitlement" even though it also indicated there was "No history" of FMLA leave within the last 30 days. Doc. 47-1, Exh. 2. Wilson denies receiving the letters. Doc. 47-1 at 37-38.

C. Backfill Decision and Replacement

On June 5, 2019, during Wilson's leave, DeAlexandris inquired about backfilling Wilson's role. Doc. 44-19, Exh. 8. Before Wilson's auto accident, DeAlexandris again inquired about backfilling Wilson's position because of the "number of days that were being missed without an estimated return to work time and due to the critical need to fill the position." Doc. 52-8 at 46-47; see Doc. 44-19 at 87-89. On August 12, 2019, DeAlexandris emailed CSXT's chief medical officer, Dr. Craig Heligman, with questions and concerns about Wilson's leave:

> Dr. H, We have another issue with Ms. Wilson. She was supposedly in an auto accident last week while out on vacation. She is now saying she will see a neurologist and cannot return to work this week. She is scheduled to start working nights this week (tomorrow evening). Her schedule continues to be 4 consecutive, 12 hour days. This will be the 3rd vacation in a row that she will not return to work for medical reasons, and we will once again have to rearrange several other employees' schedules to cover for her absence(s).
>
>  . . . Are we obligated to take her word for these events? In other words, can/should we ask for accident and/or medical documentation?

Doc. 36-1. In part, Dr. Heligman responded:

> No, we are not obligated to take her word, but we generally do. If you have some evidence to suggest that she is fraudulently reporting medically related absences, then we would want to obtain guidance from HR and Law depts. There is no company wide policy on medical related absences for management employees. You may ask her to submit FMLA documents for medical issues that may qualify for FMLA benefits. Injuries secondary to an MVA that may incur absences longer than 3 days would generally qualify for

7

> FMLA. This may be a route you want to take. I'd ask SuDelta
> Henson for guidance on that.

Doc. 36-1. Dr. Heligman advised review of Wilson's FMLA status, including any

FMLA availability, and to

> . . . have her apply for FMLA leave whenever it is appropriate to
> do so. This will run out her FMLA entitlement more quickly. Make
> sure that she appropriately applies for STD benefits. If she
> exhausts FMLA and STD benefits, then typically, you can work
> with HR to determine if her position can be filled. Regular
> attendance at work is an essential function of the job, so we would
> want to look at that issue with HR/legal to make sure we are
> following all regulations, laws, and company policies related to her
> medical related absences prior to terminating and posting her
> position.
>
> . . .
>
> Our best defense for individuals who potentially are
> abusing/misusing the system is to use good management and
> compliance with existing company and regulatory policies and
> benefits. The tighter the management using these existing items
> the easier it is. I recognize that it is frustrating to manage someone
> under these circumstances, but we do have to maintain compliance
> and if someone may be abusing/misusing the system, then following
> the existing processes will address the issue in the long run. It does
> take time to reach the end point, however.

Doc. 36-1.

DeAlexandris wanted to fill the position as soon as possible and inquired

again about backfilling the role in mid-September 2019. Doc. 44-19 at 111; Doc.

52-8, Exh. 22. Wilson's role was vacant through October 1, 2019, her expected

return date.[11] <u>See</u> Doc. 52-8 at 57-58, Exh. 30. When Wilson could not return to work October 1, 2019, CSXT contacted her and determined there was no estimate for her return to work. <u>Id.</u> CSXT decided to backfill Wilson's position because it was a critical role and she did not have an expected return date. <u>See</u> Doc. 52-8 at 57-60; Doc. 44-17 at 8. DeAlexandris wanted to fill Wilson's position because it was a role that needed to be staffed "24/7" and "they didn't have adequate resources to continue to operate" at current capacity. Doc. 52-8 at 58-60; Doc. 52-2 ¶4.

On October 3, 2019, HR sought approval to post the position. Doc. 52-8, Exh. 31. On October 9, 2019, the job was posted. Doc. 52-8 at 144. CSXT hired Nate Christman, white, to fill the vacancy. CSXT made the offer on November 5, 2019, and Christman started on November 9, 2019. Doc. 52-2 ¶¶6-7; Doc. 44-19 at 130.

On November 14, 2019, Wilson was released to return to work on November 18, 2019. Doc. 47-1 at 168. Wilson returned to work on November 19, 2019. Doc. 47-1 at 181-82. During the thirteen weeks of Wilson's unscheduled

_____

[11] Wilson argues the August 12, 2019, email is evidence CSXT had already decided to terminate her. Doc. 47-1 at 217-18. CSXT characterized the mid-September communications as a contingency plan in case Wilson did not return and testified there was not an earlier plan to replace Wilson. Doc. 52-8 at 128-29; <u>see</u> Doc. 44-19 at 118-19. DeAlexandris had requested the approval process to post the role start in mid-September in case Wilson did not return. Doc. 44-19 at 118-19.

absence,[12] the role was covered by others in the department, including by rescheduling vacation. Doc. 44-16 at 12-13.

D. <u>Work Team and Comparators</u>

Wilson was the only African American employee in her department. Doc. 47-1 at 15. Wilson had not heard Sieruga make any race-based comments, either about her or other African Americans. <u>Id.</u> at 25. Wilson had not observed Sieruga engage in any race-based conduct or conduct that might support her claim of race discrimination. <u>Id.</u> Wilson had not heard racial comments from DeAlexandris or Lovelady. <u>Id.</u> at 26-28). DeAlexandris denied Wilson's race played any part in deciding to fill her position. Doc. 52-2 ¶12.

Wilson identifies a white coworker, Brian Strachan, as someone similarly situated and treated more favorably. Strachan used FMLA, was able to remain in his position and was allowed to work from home.[13] Doc. 47-1 at 15-20. Strachan's position was Manager of Crew Operations, responsible to run reports, monitor manpower shortages and collaborate with the field on escalated issues.[14] Doc. 44-2 ¶4. Strachan reported to Don Munley, and Munley

---

[12] The time off was fifteen weeks, but the first week was already scheduled as vacation and Christman was hired a week before Wilson returned.

[13] Wilson testified Strachan was out approximately two months and that CSXT records indicated Strachan only used FMLA for two days in 2018. <u>See</u> Doc. 47-1 at 16, 19. There is no evidence Strachan exhausted FMLA.

[14] Wilson alleges Strachan's role had many of the same responsibilities but admits Strachan had a different title. Doc. 47-1 at 16.

reported to DeAlexandris. Doc. 52-2 ¶10; Doc. 59-1, Exh. E. When DeAlexandris became Head of Crew Management in November 2018, Strachan was already working remotely, but that ended almost immediately. Doc. 44-19 at 17, 35-36. Wilson was not offered an opportunity to work remotely and did not ask to work from home. Doc. 47-1 at 18, 26. Wilson's position could not be done remotely.[15] Doc. 44-16 at 8-11. Even though Strachan was in a different role, there is evidence he covered shifts for Crew Operations Supervisors, but there is no evidence he did so remotely. See Doc. 47-8 at ¶19.[16]

## II.   Analysis

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Further, the Court will construe evidence in a light most favorable to Wilson as the non-moving party. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014).

---

[15] Wilson's role did not work remotely during COVID-19. Doc. 44-16 at 1.

[16] Based on the work schedule, it appears the reference to covering shifts for Crew Operations Managers is referring to coverage of Wilson's position, Crew Operations Supervisor.

A. <u>Overview</u>

Wilson's Amended Complaint has four claims. Count One alleges FMLA interference based on failure to timely notify her of FMLA eligibility, retroactive designation of time off as FMLA, and failure to reinstate her (the demotion). Doc. 36 ¶¶66-76. Count Two alleges FMLA retaliation for failing to reinstate her and not allowing her to work remotely. Doc. 36 ¶¶81-82. Counts Three and Four allege race discrimination, under Title VII and FCRA, based on the failure to reinstate her, including that her replacement was a less qualified white man and that a white coworker was treated more favorably by being allowed to work remotely.[17] Doc. 36 ¶¶89-91, 98-100. CSXT disputes each claim and argues all claims are barred by judicial estoppel because they were not disclosed in Wilson's bankruptcy.[18] Doc. 44 at 13-17; Doc. 68 at 1-4.

---

[17] On May 20, 2020, Wilson filed a charge with the Equal Employment Opportunity Commission and was issued a Right to Sue on September 22, 2021. Docs. 36-8, 36-10. The EEOC charge included claims not raised in this lawsuit for discrimination based on disability, age, and sex.

[18] To bar claims not disclosed in bankruptcy, the court must determine the plaintiff intended to make a mockery of the judicial system. <u>See</u> <u>Slater v. United States Steel Corp.</u>, 871 F.3d 1174, 1180 (11th Cir. 2017). Wilson filed for bankruptcy on January 16, 2019, before her demotion. Doc. 44-4; Doc. 44-6; Doc. 59 at 2. Wilson argues she did not realize her employment claims needed to be disclosed until she received the EEOC Letter of Determination in August 2021, which was after her bankruptcy case had been dismissed on October 23, 2020. (Doc. 59-1). Having decided to grant summary judgment on the merits, it is not necessary for the Court to decide whether the bankruptcy bar should apply.

B.  FMLA Interference (Count One)

FMLA provides eligible employees 12 weeks of job-protected leave for qualifying reasons. 29 U.S.C. § 2612(a)(1). A FMLA interference claim requires proof an employee was denied a benefit to which they were entitled. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006) (quoting Strickland v. Water Works & Sewer Bd. of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001)). Wilson claims CSXT denied her a benefit–job reinstatement– because CSXT retroactively designated her time off as FMLA and failed to timely provide her notice of the FMLA designation. To prevail on her FMLA interference claim, Wilson must show the retroactive designation or notice deficiency was prejudicial. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002).

CSXT provided Wilson 12 weeks of FMLA leave. CSXT also retroactively designated each of Wilson's three leaves as FMLA without timely notice to Wilson of the FMLA designations and did not follow its own policies about the FMLA notice and process.

Based on information from CSXT, including the Medical Leave Policy, Wilson believed she could use 26 weeks of leave and still return to her job. Instead, after Wilson could not return to work on October 1, 2019, she learned for the first time that all three leaves had been designated as FMLA and FMLA had been exhausted on August 28, 2019, even though she had never applied for

13

FMLA and had been told she did not need to apply for FMLA. She learned CSXT planned to fill her job and she had sixty days to find another management role, accept a demotion, or be terminated.

Wilson argues the retroactive FMLA designation and notice failures were prejudicial because they prevented her from inquiring about or considering other treatment options (for her May to June leave and after her auto accident) that would have allowed her to return to work earlier and retain reinstatement rights to her job as Crew Operations Supervisor. However, Wilson does not provide evidence of other treatment options that would have allowed her to return to work before exhausting FMLA.

Wilson's three leaves totaled 23.4 weeks within a 12 month period (3.4 weeks for gall bladder, 5 weeks for anxiety and depression, and 15 fifteen weeks for auto accident).[19] Even if the 5 week leave is not considered, Wilson used

---

[19] At oral argument, for the first time, Wilson argued that CSXT's FMLA policy did not specifically state FMLA usage would be determined based on a rolling 12 months, and therefore Wilson may not have received all FMLA benefits. This argument was not raised in the summary judgment briefings and the Court deems it waived. See In re: Egidi, 571 F.3d 1156, 1163 (11th Cir. 2009); see also Sunflower Condo. Assoc., Inc. v. Everest Nat'l Ins. Co., No. 19-cv-80743, 2020 WL 4501805 at *6 (S.D. Fla. Apr. 28, 2020) (deeming argument waived when it was raised during oral argument but not the summary judgment briefing) (citations omitted) (adopted in part by 2020 WL 5757085, Sept. 28, 2020). Even so, it does not appear this argument would have made a difference in the Court's conclusion. FMLA regulations require the employer choose a method that is consistently and uniformly applied to all employees, and there is no evidence CSXT used anything other a rolling 12-month period. See 29 C.F.R. §825.200(d). Whether CSXT used a rolling 12 months, a calendar

more than 18 weeks for gall bladder surgery and to recover from the auto accident, and FMLA would have been exhausted on October 3, 2019 (five weeks after August 29, 2019). Wilson's actual return to work, November 19, 2019, was almost 6 weeks later, and there is no evidence returning earlier was an option. Assuming arguendo Wilson would have explored options to decrease her time off, there is no evidence she could shorten her time off by 12 weeks (if all three leaves were FMLA). At a minimum, she could not avoid recovery from the gall bladder surgery and auto accident, totaling more than 18 weeks.

It is true that CSXT did not comply with FMLA notice requirements or its own FMLA process. However, CSXT's lack of compliance does not amount to a viable legal claim. The Supreme Court has held technical violations are not actionable unless there is prejudice to the employee. See Ragsdale, 535 U.S. at 88-89. Following Ragsdale, the Department of Labor updated FMLA regulations to reflect this. See 29 C.F.R. §825.301(d) (an "employer may retroactively designate leave as FMLA . . . provided that the employer's failure to timely designate leave does not cause harm or injury to the employee").

Wilson received the required 12 weeks of FMLA leave. Even construing the record in a light most favorable to Wilson, there is no factual dispute that

---

year, Wilson's anniversary date, or the date of her auto accident, Wilson still received 12 weeks of FMLA, exhausted FMLA and no longer had job reinstatement rights.

she was unable to return to work after she exhausted her FMLA and therefore no longer had any reinstatement rights. See Williams v. Cadence Bank, No. 5:16-cv-266, 2018 WL 7360632, at *11 (N.D. Fla. Oct. 9, 2018) (quoting Diaz v. Transatlantic Bank, 367 F. App'x 93, 95 (11th Cir. 2010) ("If [an] employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition ... the employee has no right to restoration to another position under the FMLA.")). Thus, there is no prejudice to Wilson based on the retroactive designation of leave. Summary judgment for CSXT is therefore proper as to FMLA interference.

C. Burden Shifting for Race Discrimination and FMLA Retaliation

Without direct evidence of either race discrimination or FMLA retaliation, both claims are analyzed under the McDonnell Douglas burden shifting framework.[20] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) (race discrimination); Hurlbert, 439 F.3d at 1297 (FMLA retaliation). Under McDonnell Douglas, "[i]f the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action. If the defendant does so, the plaintiff must then show that the

---

[20] The Court is mindful the McDonnell Douglas paradigm is an evidentiary framework that does not change the ultimate question of whether there is enough evidence to establish illegal discrimination. Tynes v. Fla. Dept. of Juv. Just., 88 F.4th 939, 941 (11th Cir. 2023).

defendant's proffered reason for the adverse action is pretextual." Hurlbert, 439

F.3d at 1297 (citation omitted). To establish pretext, the plaintiff must show

"the proffered reason was not the true reason for the employment decision . . .

either directly by persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence." Jackson v. Ala. State Tenure

Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting Tex. Dep't of Cmty.

Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

   D. Race Discrimination Claims (Counts Three and Four)

   To establish a prima facie case of race discrimination, Wilson must show:

> (1) [s]he is a member of a protected class; (2) [s]he was qualified for
> the position; (3) [s]he suffered an adverse employment action; and
> (4) [s]he was replaced by a person outside [her] protected class or
> was treated less favorably than a similarly-situated individual
> outside [her] protected class.

Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing

McDonnell Douglas Corp., 411 U.S. at 802). To satisfy the fourth element, the

alleged comparator must be "similarly situated in all material respects." Lewis

v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019). A similarly situated

comparator will ordinarily have (1) engaged in the same behavior; (2) been

subject to the same employment policy, guideline, or rule; (3) have the same

supervisor; and (4) share a similar employment or disciplinary history. Id. at

1227-28.

Wilson's race claim is based on her demotion, with three, somewhat overlapping, arguments. First, she argues her managers–Lovelady, DeAlexandris, and Sieruga–were biased against her based on her race. She argues they demonstrated negative racial bias against her because she was the only African American in the department and was treated differently. Apart from Wilson's own conclusion that her managers were racially biased, there is no evidence to support a race discrimination claim. Doc. 52-8 at 11. Wilson testified she never heard of nor was aware of any racial remarks or conduct from her managers, and relied only on her own perception of better treatment of others. (Doc. 47-1 at 23-28). Wilson's examples of different treatment all involved her alleged comparators.

Wilson's second and third arguments, are based on Christman and Strachan as alleged comparators.[21] While Wilson is a member of a protected class and her demotion was an adverse employment action, she fails to establish a prima facie case of discrimination. Wilson argues she has a prima facie case because Christman, who is white, replaced her. When Christman replaced her, however, she was unable to work and therefore Wilson was not qualified for the

---

[21] Unrelated to race, Wilson claims that management bias towards her was exacerbated because she complained about supervisor conduct that violated CSXT policy. Doc. 44-10 at 76, 151.

job.[22]  Put differently, Christman is not a valid comparator because he was able to work and Wilson was not.

Wilson argues another white coworker, Strachan, is also a proper comparator and was treated better because he was allowed to work remotely, used FMLA, and retained his position. Wilson testified Strachan had similar duties, was allowed to work from home for over eight weeks, was not required to apply for short-term disability or FMLA, and retained his job, unlike her.[23] Even if Strachan had similar duties, there is no dispute he was in a different role. Wilson testified Strachan was out for about eight weeks, which is less than the 12 weeks allowed by FMLA. See Doc. 47-1 at 16-18. Wilson complains Strachan was allowed to work from home (without asking), and she was not, but there is no evidence her role could be performed remotely.[24]  Even during the height of COVID-19 restrictions, Crew Operations Supervisors did not work remotely. Strachan is not a similarly situated comparator. Thus, as a matter of

---

[22] This is true whether the time period is when CSXT made the decision to backfill the role (October 2, 2019), when CSXT offered the job to Christman (November 5, 2019), or when Christman started (November 9, 2019).

[23] Wilson's declaration mentions multiple leaves for Strachan but does not have information to indicate Strachan was off work (or used FMLA) for more than 12 weeks in any rolling 12-month period. See Doc. 47-8 ¶¶17-18.

[24] Strachan was allowed to work remotely before DeAlexandris transferred to the department, but DeAlexandris put a stop to it. Also, Wilson never asked to work from home.

law, Wilson has not made out a prima facie case of race discrimination. <u>See</u> <u>Turner v. Fla. Prepaid College Bd.</u>, 522 F. App'x 829, 833 (11th Cir. 2013).

Nor is there a convincing mosaic. [25] Wilson argues Lovelady, DeAlexandris, and Sieruga, all white, "displayed antagonism, dislike, and animus towards [her] for reasons that included racial bias," and that DeAlexandris' questions about Wilson's need for medical leave and other communications are evidence of racial bias. Doc. 36 ¶¶14, 27; Doc. 46 at 29. These few examples do not meet the convincing mosaic standard.[26] <u>Cf.</u> <u>Jenkins v. Nell</u>, 26 F.4th 1243, 1250-51 (11th Cir. 2022) (reversing summary judgment for defendant–employer after determining plaintiff—employee's evidence of disparate discipline, race–based comments, large number of departures of white operators after new manager, and additional evidence met the convincing mosaic of discrimination standard).

Even if the Court were to assume Wilson established a prima facie case, CSXT articulated a legitimate, non-discriminatory reason for failing to reinstate Wilson, and Wilson has not demonstrated pretext. <u>See</u> <u>Alvarez v.</u>

---

[25] Even without a comparator, an employee can survive summary judgment by presenting enough circumstantial evidence, a "convincing mosaic," to create a triable issue as to discriminatory intent. <u>Lewis v. City of Union City (Lewis II)</u>, 934 F.3d 1169, 1185 (11th Cir. 2019) (additional citations omitted).

[26] The DeAlexandris and related communications are discussed in more detail <u>infra</u>.

Royal Atl. Dev., Inc., 610 F.3d 1253, 1264-65 (11th Cir. 2010). To show pretext, Wilson must present evidence "to demonstrate a genuine issue of material fact as to the truth or falsity of [CSXT's] legitimate, nondiscriminatory reasons." See Schoenfeld v. Babbitt, 168 F.3d 1257, 1269 (11th Cir. 1999) (quoting Evans v. McClain of Georgia, Inc., 131 F.3d 957, 965 (11th Cir.1997)). Wilson must show CSXT's proffered reason was false by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [CSXT's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." See Silvera v. Orange Cty. Sch. Bd., 244 F.3d 1253, 1258 (11th Cir. 2001) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997)).

CSXT decided to backfill Wilson's role because it was "mission critical" and a strain on department resources to cover for Wilson's absence, especially when she was not able to return to work as scheduled and did not have an estimated return date. Wilson argues because her position was vacant for 15 weeks, it was not "mission critical" as CSXT claims. Doc. 46 at 29. To some extent, Wilson argues because CSXT held the position open until October 1, 2019 (five weeks past FMLA exhaustion), it could have (and should have) held the position open for another seven weeks until she was able to return.

This argument has several problems. First, it overlooks the consistent testimony, including from Wilson herself, that the job was critical. There is no

dispute it was vital to keep trains running, the job had to be staffed 24 hours a day every day of the year, any absence had to be covered by others, and staffing resources were limited. Second, the argument also overlooks the timing of the backfill decision. The final decision to backfill the role was made immediately once Wilson did not return to work as expected on October 1, 2019, and CSXT confirmed that Wilson did not offer an estimated return date. Relatedly, Wilson's argument includes the benefit of hindsight. When CSXT decided to backfill the position, the need for continuing coverage by others was ongoing and indefinite because neither CSXT nor Wilson knew when she might return. Wilson "is not allowed to recast [CSXT's] proffered nondiscriminatory reasons or substitute [her] business judgment for that of [CSXT's]." See Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000).

Once Wilson exhausted FMLA, CSXT was entitled to fill Wilson's job. Wilson has not provided evidence to call CSXT's reason for doing so into question; she has merely disagreed with it, and that is insufficient. So long as CSXT has provided "an honest explanation of its behavior," the Court will "not sit as a super-personnel department that reexamines an entity's business decisions." Id.

There is not a similarly situated comparator nor a convincing mosaic. Moreover, CSXT has provided a legitimate, non-discriminatory reason for not holding Wilson's job open longer and Wilson has not presented a triable issue

of pretext. Thus, summary judgment is due to be granted in favor of CSXT as to Wilson's race discrimination claims.

### E. FMLA Retaliation (Count II)

Wilson alleges CSXT retaliated for her FMLA use by failing to reinstate her as Crew Operations Supervisor and not offering her remote work. Doc. 36 ¶¶81-82. If there is no direct evidence to support a FMLA retaliation claim, courts use the McDonnell Douglas framework.[27] Lapham v. Walgreen Co., 88 F.4th 879, 889 (11th Cir. 2023). A prima facie case requires showing (1) the employee engaged in statutorily protected conduct; (2) suffered an adverse employment action; and (3) a causal connection between the two. Id. An employer can rebut the prima facie case by providing a legitimate, non-retaliatory reason for the adverse employment action, and an employee must then show the employer's reasons are mere pretext for the adverse employment

---

[27] During oral argument, Wilson, for the first time, argued emails from DeAlexandris were direct evidence of retaliation. In her Opposition to Summary Judgment, Wilson's arguments relied solely on circumstantial evidence and the burden shifting paradigm of McDonnell Douglas. Doc. 46 at 20-26. Direct evidence was not argued. In any event, these emails are not direct evidence of FMLA retaliation. See Lapham, 88 F.4th at 889 (finding evidence that included complaints about FMLA requests was not direct evidence of retaliation). Only the most blatant remarks that do not need any inference or presumption will serve as direct evidence. Fernandez v. Trees, Inc., 961 F.3d 1148, 1156 (11th Cir. 2020) (concluding that a "new policy" of "no more Cuban people" was not direct evidence of national origin discrimination for plaintiff's termination since it required an inference to conclude it extended beyond hiring and indicated an intent to terminate Cubans already employed).

action, and the adverse action would not have occurred "but for" the statutorily protected conduct. Id. at 889-92. The parties dispute whether Wilson can establish a prima facie case.[28] The Court preempts this discussion and assumes that Wilson can establish a prima facie case. However, Wilson cannot establish pretext.

Emails among DeAlexandris, CSXT's Chief Medical Officer Craig Heligman, and HR representatives Johnson and Waller, evidence discussions about Wilson's absences, backfilling her position, and FMLA designation while Wilson was out. Doc. 52-8 at 82-85, Exhs. 8-10, 12. The emails include June and September 2019 emails referencing backfilling the position and an August 12, 2019, email between DeAlexandris and Heligman about whether Wilson could or should be asked for medical documentation after the auto accident. Wilson argues these emails evidence retaliation for FMLA use, and the August email is evidence CSXT had already decided to replace her at that time.

In Lapham, the plaintiff also alleged management inquiries about her FMLA leave were evidence of retaliation. Lapham, 88 F.4th at 889. The

---

[28] Wilson engaged in protected activity by taking FMLA leave and her demotion was an adverse employment action. CSXT argues a plaintiff terminated after expiration of FMLA leave cannot establish a prima facie case of FMLA retaliation because a causal connection is lacking, while Wilson argues the temporal proximity between her demotion and end of her FMLA leave should be enough.

Eleventh Circuit disagreed, stating that at best, the communications supported an inference that plaintiff's termination was connected to her use of FMLA. See id. at 889, 894 (affirming summary judgment as to FMLA retaliation because plaintiff failed to rebut the legitimate reason for termination). The facts here are similar. DeAlexandris inquired about replacing Wilson even before FMLA was exhausted. But Wilson's position was held open well after her FMLA expired, until her expected return date of October 1, 2019. Her position was only posted after she did not return and did not have another expected date for her return. There was a legitimate business reason to replace her because her role was critical, and her absence was a hardship. Wilson cannot show CSXT's reason were pretextual.

Wilson's arguments that retaliation based on CSXT not offering her remote work fail for two reasons.[29] First, as discussed above, Strachan was not similarly situated and not a valid comparator. Second, there is no evidence that Wilson's job could be done remotely. Even during COVID-19 restrictions, Crew Operations Supervisors did not work remotely.

Accordingly, because Wilson cannot show her demotion would not have occurred "but for" her protected activity, summary judgment is due to be granted in favor of CSXT as to FMLA retaliation.

---

[29] Given the Court's reasoning, it is not necessary to decide if the failure to offer remote work is an adverse employment action.

## III.    Conclusion

CSXT should have done better in handling Wilson's FMLA leave. But, ultimately Wilson received all the FMLA benefit to which she was entitled. And, there is no evidence of race discrimination.

Accordingly, it is hereby

**ORDERED:**

1.    Defendant CSX Transportation, Inc.'s Motion for Summary Judgment (Doc. 44) is **GRANTED**;

2.    The Clerk is directed to enter judgment in favor of CSX Transportation, Inc., and against Iris N. Wilson and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 15th day of March, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

ddw
Copies:

Counsel of record